# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-41317

United States Court of Appeals
Fifth Circuit

**FILED**

May 22, 2015

Lyle W. Cayce
Clerk

ROBERT SPONG; KERRY SPONG,

      Plaintiffs–Appellees,

v.

FIDELITY NATIONAL PROPERTY AND CASUALTY INSURANCE
COMPANY; FIDELITY NATIONAL INSURANCE SERVICES, L.L.C.,

      Defendants–Appellants.

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and BENAVIDES and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

This interlocutory appeal pursuant to 28 U.S.C. § 1292(b) arises from the issuance and subsequent renewals of a flood insurance policy under the National Flood Insurance Program (NFIP) covering property owned by Robert and Kerry Spong. Hurricane Ike swept away all improvements on the Spongs' property and all personal belongings. The insurer, Fidelity National Property and Casualty Insurance Company, subsequently advised the Spongs that the policy was void from its inception because the property was ineligible for flood insurance under the NFIP. The Spongs sued Fidelity National Property and Casualty Insurance Co., its affiliate Fidelity National Insurance Services,

No. 13-41317

L.L.C., and the United States, asserting a number of federal and state-law claims. The Fidelity entities (collectively "Fidelity" for purposes of this opinion) sought summary judgment, asserting, among other grounds, that the Spongs' claims were preempted by federal law. Fidelity seeks review of the denial of that motion. Based on precedent that binds this panel, we conclude that the Spongs' state-law causes of action are not preempted by federal law to the extent that they are insurance procurement claims, but claims that pertain to or arise out of "claims handling" after the policy issued are preempted. Additionally, even though not preempted, certain claims cannot succeed as a matter of law. We remand for further proceedings.

## I

Fidelity National Property and Casualty Insurance Co. is a "Write-Your-Own" (WYO) Program insurance carrier that participates in the issuance of flood insurance under the National Flood Insurance Act (NFIA). Fidelity National Insurance Services, L.L.C. is a third-party vendor that services the federal flood insurance policies issued by Fidelity National Property and Casualty Insurance Co. The Federal Emergency Management Agency (FEMA) administers the federal flood insurance program.

In at least two prior decisions, our court has explained the NIFP's workings in more detail,[1] and we will not repeat those details today, other than to note that the exact terms and conditions of NFIP policies and eligibility for federal flood insurance are dictated by federal law. It is now beyond debate that the property at issue in the present case is and has been ineligible for federal flood insurance even before the Spongs purchased it. But two federal

---

[1] *See Grissom v. Liberty Mut. Fire Ins. Co.*, 678 F.3d 397, 399 (5th Cir. 2012); *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009).

No. 13-41317

agencies, FEMA and the Fish and Wildlife Service, had erroneously concluded otherwise at the time the Spongs obtained a policy from Fidelity.

In recounting the pertinent facts, we consider the record in the light most favorable to the Spongs who were not the movants for summary judgment.[2] The Spongs contracted to purchase an elevated home in the Caplen Shores subdivision located on the Bolivar Peninsula in Galveston County, Texas. The Spongs knew that this property was located within a flood zone and that to secure a mortgage loan, they were required to obtain flood insurance. Under federal law, however, if property is located in the John H. Chafee Coastal Barrier Resources System (CBRS), the NFIP is prohibited from issuing a flood insurance policy.[3] The CBRS, created by Congress in the Coastal Barrier Resources Act,[4] was designated to "minimize the loss of human life, wasteful expenditure of Federal revenues, and the damage to fish, wildlife, and other natural resources."[5] It was not determined with finality that the Spongs' property was within the CBRS until three years after they had purchased their property and after Hurricane Ike had destroyed all improvements on it. Because government entities vacillated over a period of years as to the property's eligibility for flood insurance, we recount the evidence in this regard in some detail.

---

[2] *Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 856 (5th Cir. 2014).

[3] *See* 16 U.S.C. § 3504(a) ("Except as provided in section 3505 of this title, no new expenditures or new financial assistance may be made available under authority of any Federal law for any purpose within the [Coastal Barrier Resources] System . . . ."); *id.* § 3502(3) (defining "financial assistance" to include the issuance of NFIP flood insurance policies); *id.* § 3505(a) (declining to include NFIP flood insurance as an exception to the prohibition established in § 3504); R. at 1233.

[4] Coastal Barrier Resources Act, Pub. L. No. 97-348, 96 Stat. 1653 (1982).

[5] 16 U.S.C. § 3501(b) (discussing the purpose of the CBRA).

No. 13-41317

The Spongs purchased the property from the Hogans. The Hogans owned two adjacent lots, 549 Caplen Shores Circle and 553 Caplen Shores Circle. The Spongs purchased the 553 Caplen Shores property. It was not until several years afterwards that Fidelity ascertained that many of the documents that relate to the present dispute, including the application for insurance and the flood insurance policy itself, referred to 549 Caplen Shores, rather than 553 Caplen Shores. However, none of the parties contends that this error or the resulting confusion is material to the issues presently before this court, and we will not differentiate between the two addresses in our references to "the property" unless otherwise indicated.

FEMA requires applicants for federal flood insurance to obtain elevation certificates, which provide a risk profile of the property to be insured, to assist in the administration of the NFIP. Eight years before the Spongs purchased their property, the Hogans had obtained an elevation certificate, dated October 22, 1998, from a private company, and that certificate said that 549 Caplen Shores was "within the Coastal Barriers Act." The U.S. Fish and Wildlife Service, however, subsequently concluded otherwise. The Fish and Wildlife Service is the agency tasked with overseeing NFIP and CBRS mapping. In 2004, two years before the Spongs purchased the property, the Fish and Wildlife Service wrote a letter, dated April 15, 2004, to the NFIP that said the "property located at 549 Caplen Shores . . . is not located within the Coastal Barrier Resources System nor an Otherwise Protected Area." The Spongs' predecessors, the Hogans, were accordingly issued a SFIP flood insurance policy on October 5, 2005, from Fidelity covering 549 Caplen Shores Circle, four months before the Spongs agreed to buy the adjoining property, in February 2006.

As part of the Spongs' purchase process, another private entity was engaged to prepare a Standard Flood Hazard Determination. That form, dated

No. 13-41317

February 22, 2006, reflected that the home on the property "is in a Coastal Barrier Resources Area (CBRA) or Otherwise Protected Area (OPA)" and stated "[f]ederal flood insurance may not be available." It also stated "CBRA/OPA designation date: 10/1/1983." However, that same form contained a box entitled "Compliance Quick Check" and "YES" was typed onto a line next to the question, "Is NFIP Insurance Available?" The form further stated: "This determination is based on examining the NFIP map, any Federal Emergency Management Agency revisions to it, and any other information needed to locate the building/mobile home on the NFIP map." This certificate was prepared for Fidelity's use in the flood insurance application process, but it is not clear whether the Spongs saw or were provided this form prior to closing.

However, a realtor involved in the Spongs' purchase transaction provided to Kerry Spong a copy of the 1998 elevation certificate, which stated that the 549 Caplen Shores Circle property was "within the Coastal Barriers Act." The Spongs had sought the services of an insurance agency, Crystal Beach Insurance, in obtaining coverage for the property they were purchasing from the Hogans, and Kerry Spong sent the 1998 certificate in PDF format to Crystal Beach Insurance. That agency submitted an application for a federal Standard Flood Insurance Policy (SFIP) on 549 Caplen Shores Circle to Fidelity on March 15, 2006, which included the April 15, 2004, letter from the Fish and Wildlife Service stating that the property was not in the CBRA. Fidelity subsequently issued a SFIP, effective March 15, 2006, covering 549 Caplen Shores Circle. The following day, March 16, 2006, the Spongs consummated the purchase of 553 Caplen Shores Circle.

About five months after the Spongs closed the purchase of the property, FEMA sent a "critical error" notice to Fidelity, dated August 8, 2006, stating that as of June 30, 2006, the flood insurance policy was invalid because the property was located in the CBRA. The notice further stated the Spongs' policy

No. 13-41317

"ha[s] no tolerance and must be cancelled[,] corrected[,] or appealed." Within the next few weeks (on August 17 and August 23, 2006), Fidelity appealed this notice and, based on the April 15, 2004, Fish and Wildlife Service letter, twice requested FEMA to remove the invalid policy code on the Spongs' policy. A month after these requests, in a letter dated September 13, 2006, the Fish and Wildlife Service once again advised the NFIP that 549 Caplen Shores Circle "is not located within the Coastal Barrier Resources System nor an Otherwise Protected Area." Based on this Fish and Wildlife Service letter, FEMA agreed that the policy was valid.

But shortly thereafter, in October 2006, FEMA sent Fidelity another critical error notice stating that the policy was invalid. A private entity prepared another Standard Flood Hazard Determination, dated November 13, 2006, which reflected that the property was located in the CBRA or Otherwise Protected Area. Fidelity appealed the October 2006 notice from FEMA, on November 27, 2006, requesting that FEMA remove the invalid policy code. FEMA again concluded that the policy was valid. The Spongs' policy was renewed in 2007 and 2008 without further incident. Fidelity did not notify the Spongs that questions had arisen regarding the policy's validity.

Hurricane Ike destroyed all improvements on the Spongs' Bolivar Peninsula property on September 12, 2008. The Spongs submitted a Proof of Loss claim under the SFIP for $208,300. Fidelity investigated the claim and discovered, for the first time, that the address of the property listed on the policy was incorrect and that the Spongs owned 553 Caplen Shores Circle, rather than 549 Caplen Shores Circle. A Standard Flood Hazard Determination was completed (dated January 2, 2009) on 553 Caplen Shores, and it reflected that the property was within the CBRS or Otherwise Protected Area. Fidelity made an inquiry to FEMA to determine whether the Spongs' property was within the CBRS, indicating to FEMA that although the flood

6

insurance policy was written to cover 549 Caplen Shores Circle, the property intended to be insured was the adjacent lot at 553 Caplen Shores Circle. FEMA contacted the Fish and Wildlife Service once again to obtain its determination, but this time, the Service advised that the property *was* located in the CBRS.

The Fish and Wildlife Services' September 25, 2009, letter to Fidelity states that its earlier April 15, 2004, letter, which had said that the property was not in the CBRS, was incorrect, explaining that the earlier determination "was based on a depiction of the subject property location provided by the homeowner's insurance agency" in the form of handwritten notes on a copy of the Flood Insurance Rate Map (FIRM) for the area. Those notes incorrectly identified the location of the property on the map as being outside of the CBRS by thousands of feet. The 2009 Fish and Wildlife Service letter did not reference or explain its 2006 determination that the property was not in the CBRA or Otherwise Protected Area. In any event, in the final analysis, the federal agencies determined that the Spongs' property was not insurable under the NFIP because it was located within the CBRS. As noted, the Coastal Barrier Resources Act prohibits the issuance of NFIP policies in CBRS zones,[6] as do the express terms of the SFIP issued to the Spongs.[7] Pursuant to federal

---

[6] 16 U.S.C. §§ 3502(3), 3504.

[7] 44 C.F.R. pt. 61, app. A(1), art. IV(15) ("We do not cover any of the following: . . . [p]roperty not eligible for flood insurance pursuant to the provisions of the Coastal Barrier Resources Act and the Coastal Barrier Improvement Act and amendments to these Acts . . . .").

7

regulations,[8] and the terms of the SFIP,[9] the Spongs' flood insurance policy was void from its inception. In accordance with federal regulations,[10] Fidelity denied the Spongs' claim for the full policy limits of $208,300 and returned all of the premiums they had paid.

The Spongs filed suit in state court, asserting a number of tort claims and statutory violations. Fidelity removed the case to federal court. The Spongs sought a remand claiming lack of federal jurisdiction, but the court denied their request, concluding federal funds were at risk as FEMA would likely pay any judgment the Spongs obtained against Fidelity. Fidelity then moved for summary judgment asserting that federal law preempted the Spongs' state-law claims and that even if not preempted, the state-law claims failed because justifiable reliance on any representations by Fidelity could not be established as a matter of law. The magistrate judge denied that motion on both grounds but certified the order denying summary judgment for interlocutory appeal, specifically certifying the preemption question.

The Spongs have sued the United States as well as the Fidelity entities. The Spongs also initially included their insurance agent, Crystal Beach Insurance Agency in the suit, but Crystal Beach filed bankruptcy and was severed from the case. Only issues pertaining to Fidelity's motion for summary judgment are before us in this interlocutory appeal.

---

[8] 44 C.F.R. § 71.5(a) ("Any flood insurance policy which has been issued where the terms of this section have not been complied with or is otherwise inconsistent with the provisions of this section, is void ab initio and without effect."); *id.* § 71.3(a) ("No new flood insurance coverage may be provided on or after October 1, 1983, for any new construction or substantial improvement of a structure located in an area identified as being in the CBRS both as of October 18, 1982, and as of November 16, 1990.").

[9] *See* 44 C.F.R. pt. 61, app. A(1), art. VII(B)(4)(b) ("This policy is void from its inception and has no legal force under the following conditions: . . . [if] the property listed on the application is otherwise not eligible for coverage under the NFIP.").

[10] *See* 44 C.F.R. § 71.5(a); *id.* § 71.3(a).

No. 13-41317

## II

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c). With respect to the issue of preemption, the magistrate judge commented that "this Court does not believe that [*Campo v. Allstate Insurance Co.*[11]] will survive reexamination by the Fifth Circuit," but concluded that it was bound by our court's decision in *Campo,* which held that federal law does not preempt policy-procurement-related claims.[12] Shortly after our decision in *Campo*, FEMA issued a bulletin that cited and disagreed with *Campo*, stating that "FEMA previously understood and intended its regulations to preempt state law claims related to policy formation, renewal, and administration arising from allegations of WYO Company error as distinct from agency error."[13] The bulletin also expressed FEMA's view that "preemption should apply to the nationally uniform and FEMA-mandated processes governing policy issuance."[14] The magistrate judge concluded, for various reasons, that the bulletin was not an intervening change in the law that would permit the district court to conclude that *Campo* was no longer controlling precedent. The magistrate judge therefore concluded that the Spongs' state-law claims were not preempted. However, the magistrate judge determined that an interlocutory appeal under 28 U.S.C. § 1292(b) was warranted. The question certified is whether our decision in *Campo v. Allstate Insurance Co.*[15] "should be reversed or has been superseded by FEMA's

---

[11] 562 F.3d 751 (5th Cir. 2009).

[12] *Id.* at 757.

[13] Memorandum from Edward L. Connor, Acting Fed. Ins. Adm'r, Nat'l Flood Ins. Program, to Write Your Own (WYO) Co. Principal Coordinators, Nat'l Flood Ins. Program Servicing Agent, and Select Adjusting Firms (July 16, 2009), *available at* http://www.nfipiservice.com/stakeholder/pdf/bulletin/w-09038.pdf.

[14] *Id.*

[15] 562 F.3d 751 (5th Cir. 2009).

pronouncement and whether all NFIP policy procurement disputes are preempted by federal law."

## III

We review de novo the denial of a motion for summary judgment, viewing the facts in the light most favorable to the non-movant.[16] Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[17]

We also review de novo orders certified for interlocutory appeal under 28 U.S.C. § 1292(b).[18] We address only "controlling questions of law" and our inquiry "is limited to the summary judgment record before the trial court."[19]

## IV

The Spongs contend this court lacks jurisdiction to hear the interlocutory appeal. We disagree.

First, the Spongs argue that there is no federal-question jurisdiction. But in paragraph 41 of their Second Amended Complaint, the Spongs have asserted that Fidelity should be equitably estopped from denying coverage under the policy that it issued. This is a claim for benefits under a federal flood insurance policy over which the district court had federal-question jurisdiction.[20] Fidelity contends that this equitable estoppel issue is not part

---

[16] *Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 856 (5th Cir. 2014).

[17] FED. R. CIV. P. 56(a).

[18] *Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 397 (5th Cir. 2010) (en banc).

[19] *Id.* (citations omitted) (internal quotation marks omitted).

[20] *See Borden v. Allstate Ins. Co.*, 589 F.3d 168, 172 (5th Cir. 2009), which held:

In *West v. Harris*, 573 F.2d 873 (5th Cir.1978), this court held that federal law applies to a dispute under a policy issued pursuant to the NFIP, which is a federal program effectuating federal policies and paid for by the federal fisc. *Id.* at 881. Thus, as our sister circuits have held, an action for

No. 13-41317

of the interlocutory appeal, but even if that were correct, an issue on which we express no opinion, that fact would not deprive this court of jurisdiction over the questions certified by the district court since the district court had jurisdiction of the entire case against Fidelity, and our jurisdiction is derivative of that jurisdiction.

Second, the Spongs contend that the questions certified do not involve a controlling question of law. Whether federal law preempts the Spongs' claims certainly falls within the ambit of 28 U.S.C. § 1292(b). That statute provides for appellate jurisdiction over interlocutory appeals from orders which involve "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from [which] may materially advance the ultimate termination of the litigation."[21]

We note additionally that while we may not reach beyond the summary judgment order to address other orders in the case,[22] we are free to address "questions that are material to the lower court's certified order."[23] Accordingly,

---

breach of an SFIP, a policy issued pursuant to the NFIP, satisfies § 1331 by raising a substantial question of federal law. *See Studio Frames Ltd. v. Standard Fire Ins. Co.*, 369 F.3d 376, 379-80 (4th Cir. 2004); *Downey v. State Farm Fire & Cas. Co.*, 266 F.3d 675, 681-82 (7th Cir. 2001) (predicating jurisdiction on the doctrine of *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), which "establishe[d] that, when the duties or rights of the United States are at stake under a federal program, that federal interest requires the application . . . of federal law"); *Newton v. Capital Assur. Co.*, 209 F.3d 1302, 1304-05 (11th Cir. 2000); *Van Holt v. Liberty Mut. Fire Ins. Co.*, 163 F.3d 161, 167 (3d Cir. 1998). That state law may control some aspects of the relation between the policyholder and insurance company, *see*, *e.g.*, *Campo v. Allstate Ins. Co.*, 562 F.3d 751 (5th Cir. 2009), does not eliminate federal jurisdiction, which promotes uniformity in the interpretation of policies backed by the federal fisc. *See Clearfield Trust*, *supra*, 63 S.Ct. at 575.

[21] 28 U.S.C. § 1292(b).

[22] *United States v. Stanley*, 483 U.S. 669, 677 (1987).

[23] *Castellanos-Contreras*, 622 F.3d at 398 (citation omitted) (internal quotation marks omitted).

No. 13-41317

we review both Fidelity's federal preemption and reasonable reliance arguments.

## V

Congress enacted the National Flood Insurance Act of 1968 (NFIA) to make flood insurance available at reasonable prices and on reasonable terms.[24] To help ease the administrative burden on the government, Congress established the Write-Your-Own (WYO) insurance program, wherein it partnered with private insurers to issue SFIPs in the insurers' names.[25] The federal government underwrites these policies, but WYO carriers (like Fidelity National Property & Casualty Insurance Co.) perform key administrative functions, such as "arrang[ing] for the adjustment, settlement, payment and defense of all claims arising from the policies."[26] FEMA regulations govern the adjustment and payment of claims by WYO carriers and set the terms of the SFIP through an agreement called the "Arrangement."[27] When policyholders sue their WYO carriers for payment of a claim, FEMA reimburses these costs unless "the litigation is grounded in actions by the [WYO] Company that are significantly outside the scope of this Arrangement, and/or involves issues of agent negligence."[28]

The question is whether this congressional scheme preempts state tort claims pertaining to the marketing and selling of policies (which we have dubbed "procurement"). In *Campo v. Allstate Insurance Co.*, we held the NFIA

---

[24] 42 U.S.C. § 4001.

[25] 44 C.F.R. § 62.23.

[26] *Gallup v. Omaha Prop. & Cas. Co.*, 434 F.3d 341, 342 (5th Cir. 2005).

[27] 44 C.F.R. pt. 62, app. A; *see id.* §§ 61.4(b), 62.23(c)-(d); *see also Gallup*, 434 F.3d at 342.

[28] 44 C.F.R. pt. 62, app. A, art. III(D)(3)(a).

did not preempt state-law procurement-based claims.[29]  We reasoned that while FEMA extensively regulates WYO administration of flood insurance policies, it "demonstrate[es] no such interest in procurement: A WYO carrier has significant independence and 'utilize[s] its own customary standards, staff, and independent contractor resources, as it would in ordinary and necessary conduct of its own business affairs, subject to [the Act and regulations].'"[30]

Fidelity argues we should overrule or limit our holding in *Campo* because an intervening change in law invalidated the decision and because *Campo* and its progeny were mistakenly decided.

## A

Fidelity contends FEMA's repudiation of *Campo* constitutes an intervening change in law.  We cannot overturn a prior panel decision and are bound by prior precedent unless there is such an intervening change:

> It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court.  Indeed, even if a panel's interpretation of the law appears flawed, the rule of orderliness prevents a subsequent panel from declaring it void.[31]

After we decided *Campo*, Edward L. Connor, the Acting Federal Insurance Administrator of the NFIP, issued a regulatory bulletin disagreeing with our decision.  In that bulletin, Connor argued that:

> FEMA previously understood and intended its regulations to preempt state-law claims related to policy formation, renewal, and

---

[29] 562 F.3d 751, 754, 757 (5th Cir. 2009) ("Federal law preempts state tort claims arising from *claims handling* by a WYO. . . .  [But] federal law does not preempt state-law procurement-based claims." (citations omitted) (internal quotation marks omitted)).

[30] *Id.* at 758 (second and third alterations in original) (quoting *Spence v. Omaha Indem. Ins. Co.*, 996 F.2d 793, 796 & n.15 (5th Cir. 1993)).

[31] *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) (citation omitted).

13

administration arising from allegations of WYO Company error . . . . FEMA understood and intended preemption to apply, particularly where there is a conflict with a Federal regulation on the manner in which policies were administered, and also had expressly preempted state law related to claims handling. To the extent there are conflicts between Federal and state law, FEMA recognizes that application of state laws would interfere with the implementation of the National Flood Insurance Program and would frustrate the national purpose and scope of the program.

Rather than its application in *Campo*, federal preemption should apply not just to claims handling activities, but also to policy administration. Specifically, preemption should apply to the nationally uniform and FEMA-mandated processes governing policy issuance and the administration of existing flood policies, including but not limited to rating, renewal, transfer, non-renewal, cancellation, or reformation. . . .

In light of *Campo*, FEMA will review its regulations to determine whether clarification is required to fully implement its intended scope of preemption. FEMA understands *Campo*, however, not to preclude application of preemption related to issuance, renewal, or administration of policies where there is an express conflict with a Federal statute or regulation.

But following the issuance of this bulletin, FEMA took no further action to clarify the scope of the NFIP's intended preemptive effect. It did not amend its regulations. Fidelity does attach to its summary judgment motion an August 2013 declaration from James A. Sadler, the Director of Claims for the NFIP. But this declaration merely reiterates the position FEMA took in the Connor bulletin; it points to no independent authority indicating Congress intended the NFIP to preempt state tort-law procurement-based claims. The Connor bulletin and the Sadler declaration are the only post-*Campo* authorities Fidelity cites in support of its argument that this decision is no longer controlling.

No. 13-41317

An intervening change in law must be binding on this court.[32]  Fidelity contends we must treat the two FEMA pronouncements as binding under various theories of administrative deference.  This argument is unpersuasive because the Supreme Court has directed us not to "defer[] to an agency's *conclusion* that state law is preempted . . . [because] agencies have no special authority to pronounce on preemption absent delegation by Congress."[33]  Rather, "[t]he weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness."[34]  Our court has previously noted that the FEMA bulletin "is not controlling."[35]  Therefore, as FEMA's proclamations regarding the scope of its own preemptive authority are merely persuasive, not binding, we are not free to revisit *Campo*.

### B

Applying *Campo*, as we must, we hold federal law does not preempt the Spongs' policy-procurement claims.  While the NFIA preempts claims-handling causes of action and claims, it does not preempt procurement claims.[36]  "The key factor to determine if an interaction with an insurer is 'claims handling' is the status of the insured at the time of the interaction between the parties.  If the individual is already covered . . . the interactions between the insurer and insured . . . are 'claims handling' subject to preemption."[37]  Here, the Spongs

---

[32] *See id.*

[33] *Wyeth v. Levine*, 555 U.S. 555, 576-77 (2009); *see also Franks Inv. Co. v. Union Pac. R.R. Co.*, 593 F.3d 404, 413 (5th Cir. 2010) (en banc).

[34] *Wyeth*, 555 U.S. at 577 (citing *United States v. Mead Corp.*, 533 U.S. 218, 234-35 (2001); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

[35] *Grissom v. Liberty Mut. Fire Ins. Co.*, 678 F.3d 397, 401 n.2 (5th Cir. 2012).

[36] *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754, 757 (5th Cir. 2009).

[37] *Grissom*, 678 F.3d at 401 (citations omitted).

15

No. 13-41317

were not already covered by flood insurance at the time the policy issued on March 16, 2006; they were in the position of "potential future policyholder[s]."[38] Accordingly, federal law does not preempt their state tort-law claims to the extent that they implicate Fidelity's acts or omissions regarding issuance of the policy because those claims are procurement-based, not claims-handling-based.

However, to the extent that the Spongs contend that Fidelity is liable for the manner in which it denied or processed their claim for flood damage, or the reasons that it gave for denying coverage and voiding the policy, the claims are preempted. For example, the Spongs contend that Fidelity breached a duty to them or should otherwise be found liable under state law because, after Hurricane Ike, Fidelity asked FEMA whether the property was within the CBRS. The actions Fidelity took in processing the Spongs' claim, or any omissions in processing that claim, are claims-handling based and are preempted.

## VI

Fidelity contends that even if state-law claims are not preempted, the Spongs' state-law claims cannot succeed in light of two decisions of the Supreme Court, *Federal Crop Insurance Corp. v. Merrill*[39] and *Heckler v. Community Health Services of Crawford County*.[40] The Spongs have alleged claims under Texas law for negligence, negligent misrepresentations, Texas Insurance Code violations, Deceptive Trade Practices-Consumer Protection Act violations, gross negligence, fraud, fraud by non-disclosure, fraudulent inducement, and promissory estoppel. In its motion for summary judgment,

---

[38] *Id.* (quoting *Campo*, 562 F.3d at 756).

[39] 332 U.S. 380 (1947).

[40] 467 U.S. 51 (1984).

No. 13-41317

Fidelity did not analyze the specific elements of all of these claims. But Fidelity did contend that no theory of detrimental reliance, including reliance on misrepresentations or negligent misrepresentations by Fidelity, could succeed as a matter of law. Because the parties have not briefed the application of the reasoning in *Merrill* and *Heckler* to each of the Spongs' state-law claims, we do not address today these issues. However, we agree that certain aspects of the Spongs' claims cannot succeed.

As an initial matter, we note that since December 31, 2000, all SFIP's, including the Spongs' policy, contain a provision that says:

> This policy and all disputes arising from the handling of any claim under the policy are governed exclusively by the flood insurance regulations issued by FEMA, the National Flood Insurance Act of 1968, as amended (42 U.S.C. 4001, et seq.), and Federal common law.[41]

Since neither the Spongs nor Fidelity contends that federal common law, rather than state law, governs the Spongs' claims in this case, we will assume, without deciding, that state law is applicable to the Spongs' claims.

Both *Merrill* and *Heckler* dealt with suits against the Government or a governmental entity, but there is reasoning in these opinions that applies, by analogy, to the Spongs' claims against Fidelity. In *Merrill*, farmers applied for insurance under the Federal Crop Insurance Act, which was administered by the Federal Crop Insurance Corporation.[42] That corporation was a wholly Government-owned enterprise created under the Act,[43] and the corporation created the Bonneville County Agricultural Conservation Committee to act as

---

[41] 44 C.F.R. pt. 61, app.A(1), art. IX.

[42] *Merrill*, 332 U.S. at 382.

[43] *Id*. at 381.

its agent.[44]  The farmers who applied for crop insurance told the Bonneville County Committee that they were planting 460 acres of spring wheat but that on 400 of those acres, they were reseeding winter wheat.[45]  The Bonneville County Committee advised the crop owners that the entire crop was insurable when in fact, federal wheat crop insurance regulations prohibited the insuring of reseeded winter wheat.[46]  A drought destroyed most of the farmers' wheat crop, and, when the Crop Insurance Corporation denied the farmers' claim under the policy, the farmers sued the Corporation.[47]  The Supreme Court held that the farmers could not recover because "[j]ust as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents."[48]  The Supreme Court concluded:

> Accordingly, the Wheat Crop Insurance Regulations were binding on all who sought to come within the Federal Crop Insurance Act, regardless of actual knowledge of what is in the Regulations or of the hardship resulting from innocent ignorance.[49]

In *Heckler*, Travelers Insurance, acting as a fiscal intermediary for the Government,[50] mistakenly interpreted federal regulations, telling a home health care provider of services to individuals eligible for benefits under Medicare that certain salaries were reimbursable under the Medicare

---

[44] *See id.* at 382.

[45] *Id.*

[46] *Id.* at 382, 386.

[47] *Id.* at 382.

[48] *Id.* at 384-85.

[49] *Id.* at 385; *see also Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 64 (1984) (explaining that participants in federal insurance programs have a duty to familiarize themselves with the legal requirements for obtaining benefits).

[50] *Heckler*, 467 U.S. at 64.

program.[51]    The non-profit health care provider received Medicare reimbursements for salaries it paid for over three years.[52]  Regulatory officials eventually determined that the reimbursements should not have been made and demanded refunds.[53]    The health care provider argued that the Government should be estopped by the action of the Government's intermediary, Travelers, because the health care provider reasonably relied on Travelers' representations.  The Supreme Court disagreed, explaining "that it is well settled that the Government may not be estopped on the same terms as any other litigant."[54]    Although *Heckler* dealt with claims against the Government rather than a private entity, aspects of the Supreme Court's reasoning has implications for the present case.  The Court explained that

> [a]s a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements for cost reimbursement.    Since it also had elected to receive reimbursement through Travelers, it also was acquainted with the nature of and limitations on the role of a fiscal intermediary.[55]

The Court concluded in *Heckler* that the health care provider's reliance on Traveler's interpretation of the federal regulations was unreasonable, explaining:

> Nor was the advice given [by Travelers] given under circumstances that should have induced respondent's reliance.  As a recipient of public funds well acquainted with the role of a fiscal intermediary, respondent knew Travelers only acted as a conduit; it could not resolve policy questions.  The relevant statute, regulations, and

---

[51] *Id.* at 55-56.

[52] *See id.* at 57.

[53] *Id.*

[54] *Id.* at 60.

[55] *Id.* at 64.

No. 13-41317

Reimbursement Manual, with which respondent should have been and was acquainted, made that perfectly clear.[56]

In the present case, Fidelity is an intermediary for the Government. The Spongs' applied for a flood insurance policy that was part of a federal program, with the understanding that covered claims would be paid with federal funds. The Coastal Barrier Resources Act provides that federal flood insurance cannot be issued for property in the CBRS.[57] Federal regulations are also clear on this point.[58] Under the rationale of *Merrill* and *Heckler*, the Spongs cannot claim ignorance of the statutes and regulations as an excuse for relying on Fidelity's issuance of a policy as a determination or representation that their property was not located in the CBRS.

The Spongs' policy also states that it does not cover property that is located in the CBRS. Article IV of the policy lists what is not covered:

### IV. PROPERTY NOT COVERED

We do not cover any of the following property:

15. Property not eligible for flood insurance pursuant to the provisions of the Coastal Barrier Resources Act and the Coastal Barrier Improvement Act and amendments to these Acts[.]

The Spongs' policy also states: "This policy is void from its inception and has no legal force under the following conditions: . . . [if] the property listed on the application is otherwise not eligible for coverage under the NFIP."[59] The terms of the Spongs' policy were standard and were contained, word for word, in the

---

[56] *Id.* at 64-65.

[57] 16 U.S.C. §§ 3502(3), 3504.

[58] 44 C.F.R. pt. 61, app. A(1), art. IV(15); *id.* § 71.3(a) ("No new flood insurance coverage may be provided on or after October 1, 1983, for any new construction or substantial improvement of a structure located in an area identified as being in the CBRS both as of October 18, 1982, and as of November 16, 1990.").

[59] *See* 44 C.F.R. pt. 61, app. A(1), art. VII(B)(4)(b).

No. 13-41317

Code of Federal Regulations.[60]  The Spongs had constructive, if not actual, knowledge that the policy Fidelity issued did not cover property within the CBRS.

> As the Supreme Court admonished in *Heckler*,
>
> "Men must turn square corners when they deal with the Government." . . .   Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law; respondent could expect no less than to be held to the most demanding standards in its quest for public funds.[61]

The Spongs were seeking coverage that was to be provided from public funds. It was incumbent upon the Spongs to determine whether their property was eligible for a SFIP.  In determining whether the property was within the CBRS and therefore eligible for a federal flood insurance policy, Fidelity was acting as the representative of the Government, not the Spongs.  The Spongs could not reasonably rely on Fidelity to make that determination for them.

Moreover, at the time that the Spongs applied for a flood insurance policy and Fidelity issued the policy, the Spongs were in possession of essentially the same facts as Fidelity.  Before the Spongs applied for the policy, a realtor gave them a copy of the 1998 elevation certificate, which stated that the property was "within the Coastal Barriers Act."  Kerry Spong sent a PDF image of this elevation certificate to the Spongs' insurance agent, Crystal Beach Insurance. However, at the time that the Spongs' obtained the policy from Fidelity, there was other evidence that the property was not in the CBRS.  Crystal Beach Insurance had in its possession the 2004 letter from the Fish and Wildlife

---

[60] *See* 44 C.F.R. pt. 61, app. A(1).

[61] *Heckler*, 467 U.S. at 63 (quoting *Rock Island, Ark. & La. R.R. Co. v. United States*, 254 U.S. 141, 143 (1920) (HOLMES, J.)).

21

No. 13-41317

Service to the NFIP stating that the property was *not* within the CBRS or Otherwise Protected Area.  The Spongs' agent furnished that 2004 Fish and Wildlife Services letter to Fidelity as part of the flood insurance application.  Accordingly, at the time the Spongs applied for an SFIP, they had documents in their possession that conflicted as to whether the property was within the CBRS.  They, or their agent, gave Fidelity the same information.  The Spongs could not reasonably rely on the issuance of an SFIP by Fidelity as a representation that their property was not in the CBRS.

Additionally, in the federal flood insurance scheme, Fidelity was a conduit.  Under the regulatory scheme, questions as to whether a property was in the CBRS were examined in consultation with the Fish and Wildlife Service.  For example, a notice of a Final Rule published by the Department of Interior in 1983 explains that a statutory ban went into effect on October 1, 1983, prohibiting the sale of new federal flood insurance for new structures or substantial improvements on property located within the CBRS.[62]  That same notice reflects that "Secretarial Order 3093 delegated responsibility for Section 6 to the Fish and Wildlife Service (Service) on April 28, 1983."[63]  Section 6 of the CBRA pertains to "responding to requests for consultation from other Federal agencies regarding exceptions to Federal expenditures in the CBRS."[64]  The 1995 Fish and Wildlife Service Manual explains that the Service is to keep the Department of Interior maps of the CBRS in various of its offices and available to the public; the Service makes interpretations of the CBRS maps as well as interpretations of the boundaries of the units; the maps and aerial

---

[62] Coastal Barrier Resources Act, Advisory Guidelines, 48 Fed. Reg. 45,664, 45,664 (1983); *accord* 44 C.F.R. § 71.3(a).

[63] Advisory Guidelines, 48 Fed. Reg. at 45, 664.

[64] UNITED STATES FISH AND WILDLIFE SERVICE MANUAL, 651 FW 1, FWM # 229 (October 8, 1995), *available at* http://www.fws.gov/policy/651fw1.html.

photos that the Fish and Wildlife Service has regarding the CBRS are to "aid in determining exact location of units and OPA boundaries during consultation activities as well as when answering inquiries from Congress; other Federal, State, and local governments; private organizations; and the general public"; and the Fish and Wildlife Service is responsible for ensuring that FEMA is accurately transferring the boundaries of CBRS units onto FEMA's Flood Insurance Rate Maps (FIRM).[65]  The 1995 Fish and Wildlife Manual explains that "[t]hese maps are the tool used by FEMA to determine flood insurance eligibility."[66]  The Manual also states that a response by the Fish and Wildlife Service to a consultation request from another agency "is in the form of an opinion only.  The Service has not been granted veto power."[67]  The Spongs could have contacted FEMA or the Fish and Wildlife Service to obtain a determination of whether their property was in the CBRS.  They could have consulted the maps publicly available.  They did not do so even though they were in possession of an elevation certificate from a private company that stated the property was "within the Coastal Barriers Act."

After Fidelity issued a policy to the Spongs, and questions were raised by FEMA as to whether the Spongs' property was located within the CBRS, FEMA accepted the determinations of the Fish and Wildlife Service that the property was not in the CBRS.  It was not until 2009, after Hurricane Ike had occurred, that the Fish and Wildlife Service changed its determination and advised FEMA that the Spongs' property *was* in the CBRS, and that FEMA made a final determination that the property was uninsurable under the federal flood insurance program.  These agency determinations were not

---

[65] *Id.*

[66] *Id.*

[67] *Id.*

No. 13-41317

within Fidelity's control. The Spongs complain that Fidelity contacted FEMA after Hurricane Ike to confirm whether the property was within the CBRS, implying that Fidelity had an obligation to the Spongs simply to remain silent and process the Spongs' claim. But Fidelity had obligations to the Government. Government funds, not Fidelity's funds, would have been used to pay the Spongs' claims had the policy been valid. Fidelity did not have a duty to remain silent, as the Spongs suggest.

Even were we to assume that after it issued the policy, Fidelity had a duty to notify the Spongs that questions had been raised about the policy's validity, and we assumed that claims regarding Fidelity's conduct after initial issuance of the policy are not preempted, detrimental reliance is problematic. The Spongs would have to establish that had they known the facts known to Fidelity at the time that FEMA raised questions, they could have and would have obtained private flood insurance or could have and would have taken other action to eliminate or reduce their exposure to loss from events such as Hurricane Ike. There is no such evidence in response to the motion for summary judgment.

The record also reflects that the initial source of the misinformation regarding the location of the property that the Spongs purchased from the Hogans was not Fidelity. In 2009, after Hurricane Ike, the Fish and Wildlife Service advised that its April 2004 determination that the property was not within the CBRS was based on mistaken information given to it by the insurance agency for the Spongs' predecessors-in-interest. No one has challenged the accuracy of the Fish and Wildlife Service's determination as to the cause of its error regarding the actual location of the property. Fidelity played no role in providing inaccurate information to the Fish and Wildlife Service as to the property's physical location, but the Spongs' predecessors did. Had the Spongs' predecessors provided accurate information, it is difficult to

24

No. 13-41317

see how FEMA and the Fish and Wildlife Service would have concluded for so many years that the property at issue was not in the CBRS when in fact, it was.

We recognize the difficult position in which the Spongs find themselves. However, they sought to obtain a federal insurance policy on property that, under federal law, is uninsurable. Based on the evidence presented for summary judgment, the issuance of a policy by Fidelity was not a representation on which the Spongs could rely.

*     *     *

We conclude that the denial of Fidelity's motion for summary judgment was erroneous at least in part and that the motion for summary judgment should be reconsidered in light of our response to the question certified. We remand for further proceedings consistent with this opinion.